Richard S. Busch (TN Bar # 14594)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201
Telephone:     (615) 726-5422
Facsimile:     (615) 726-5417

John E. Mason, Jr. (TN Bar # 32680)
LAW OFFICE OF JOHN MASON, LLC
40 Music Square West
Nashville, TN 37203
Telephone:     (615) 259-5325
Facsimile:     (615) 259-5321

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| ROBERT GAUDIO d/b/a SEASONS FOUR MUSIC, ALL SEASONS MUSIC, NEW SEASONS MUSIC, GAVADIMA MUSIC, SEASONS MUSIC; THE FOUR SEASONS PARTNERSHIP,<br><br> Plaintiffs,<br><br>vs.<br><br>SPOTIFY USA INC.,<br><br> Defendant. | No. _____<br><br><br>**COMPLAINT FOR COPYRIGHT INFRINGEMENT**<br><br><br>**JURY DEMAND** |

## COMPLAINT

## NATURE OF THE ACTION

1.      This is an action for willful copyright infringement brought by Plaintiffs Robert

"Bob" Gaudio d/b/a Seasons Four Music, All Seasons Music, New Seasons Music, Gavadima

Music, Seasons Music, and The Four Seasons Partnership (collectively "Plaintiffs"), the copyright

1

owners of numerous world famous musical compositions, against Spotify USA Inc. ("Spotify" or "Defendant"), for its unauthorized use of Plaintiffs' musical compositions listed in the attached Exhibits (the "Infringed Works") in blatant disregard of the exclusive rights that are vested in copyright owners.

2. As alleged more fully below, Spotify has built a multi-***billion*** dollar business with no assets other than the songs made available on its digital platform. Yet, as recent class action lawsuits and settlements against it have firmly established, Spotify built its behemoth by willfully infringing on the copyrights of creators of music worldwide without building the infrastructure needed to ensure that the songs appearing on the Spotify service were properly licensed or that appropriate royalties were paid on time (or at all) in compliance with the United States Copyright Act. Spotify's apparent business model from the outset was to commit willful copyright infringement first, ask questions later, and try to settle on the cheap when inevitably sued.

3. For the reasons discussed below, prior lawsuits and settlements are woefully inadequate (at least in part because the lion's share of the money goes into the pockets of the major publishing companies, whose affiliated record labels own a substantial share of Spotify in the aggregate and thus have no incentive to truly seek appropriate redress for Spotify's wrongdoing), and do not nearly compensate publishers for the value of Spotify built on unlawful exploitation, or punish Spotify sufficiently for its willful infringement. Spotify's actions since its launch have not only been willful, but brazenly so, and justify the imposition of the maximum award of statutory damages in the amount of $150,000.00 for each act of copyright infringement.

4. There are 106 copyrighted works involved in this action that are collectively listed on Exhibit A attached hereto. Any license Spotify may have had to reproduce and stream these compositions was terminated, no later than July of 2016, following the termination letters sent to

Spotify in June of 2016, for failure to comply with the law and applicable requirements. Yet, on information and belief, Spotify has continued to reproduce and stream these musical compositions and has committed willful copyright infringement thereby. Plaintiffs have also been able to confirm that, at least since 2015, and, upon information and belief, since inception, it received no payment at all on at least 4 of these Exhibit A musical compositions, separated out on Exhibit B attached hereto, meaning that it is likely that no license was ever obtained by Spotify, and Spotify has been committing willful copyright infringement with respect to these musical compositions since inception. The same is true of the 28 of these Exhibit A musical compositions, separated out on Exhibit C attached hereto, which, upon information and belief, have also streamed on Spotify but no payment was ever received by Plaintiffs. The only difference between the Exhibit B musical compositions, and those identified on Exhibit C, is that Plaintiffs have been able to identify ISRC codes (explained below) with respect to the Exhibit B musical compositions. Nonetheless, upon information and belief, the Exhibit C musical compositions have at least one associated sound recording that embodies the composition that has streamed on Spotify. Finally, there are 74 of these Exhibit A musical compositions, separated out on Exhibit D attached hereto, for which incomplete or partial payments have been made by Spotify and Spotify otherwise failed to comply with Section 115 of the United States Copyright Act. Any license Spotify ever had related to these musical compositions, and all other Exhibit A musical compositions, was therefore terminated for failure to comply with Section 115 of the United States Copyright Act.

5.     Spotify has never provided proof of licensing with respect to any of the Exhibit A musical compositions even though Plaintiffs requested in writing proof of licensing.

6.     In light of the willful actions of Spotify, including willful blindness, anything less than the maximum $150,000 statutory damage award for each of the Infringed Works involved

herein would encourage infringement, amount to a slap on the wrist, and reward a multi-billion dollar company, about to go public, that rules the streaming market through a pattern of willful infringement on a staggering scale.

## PARTIES

7.     Plaintiff Robert "Bob" Gaudio d/b/a Seasons Four Music, All Seasons Music, New Seasons Music, Gavadima Music, Seasons Music (hereinafter "Gaudio" or "Mr. Gaudio") is an individual who is a citizen of Nashville, Tennessee.  Mr. Gaudio is a songwriter, musician, performer and record producer, and was a founding member, performer, and primary songwriter of the world renowned musical group Frankie Valli and the Four Seasons (hereinafter "The Four Seasons"), that has enjoyed one of the most successful careers of any musical act in history as evidenced by record sales exceeding 100 million copies, induction into the Rock and Roll Hall of Fame, and induction into the Vocal Group Hall of Fame. Among his numerous songwriting credits are such iconic hits as "Can't take My Eyes Off You", "Dawn (Go Away)", "Ronnie", "Rag Doll", "Save It For Me", "Big Man in Town", "Bye Bye Baby", "Girl Come Running" and "Beggin".  In addition to his work with The Four Seasons, Mr. Gaudio has written musical compositions and produced recordings of other famous artists.  Mr. Gaudio was also instrumental in the creation of and had many of his musical compositions featured in "Jersey Boys," based on the lives of The Four Seasons, which won four Tony Awards, including Best Musical, a Grammy Award for Best Musical Show Album, and was adapted into a hit feature film *Jersey Boys* produced and directed by Clint Eastwood. Additionally, Mr. Gaudio is a member of the Songwriters Hall of Fame.

8.     The Four Seasons Partnership is a partnership based in and operating under the laws of California.

9. Defendant Spotify USA Inc. is a Delaware corporation with its principal place of business at 45 W. 18th Street, 7th Floor, New York, New York 10011. Spotify maintains a corporate office in Nashville, Tennessee located at 1033 Demonbreun Street, Nashville, Tennessee 37203.

## JURISDICTION AND VENUE

10. The jurisdiction of this Court with respect to the copyright infringement claims is based upon 28 U.S.C. §§ 1331 and 1338(a) in that the controversy arises under the Copyright Act and Copyright Revision Act of 1976 (17 U.S.C. § 101 *et seq.*), which is within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. § 1331.

11. This Court has general personal jurisdiction over Defendant because Defendant has continuous and systematic contacts within the Middle District of Tennessee such that it can be found to be essentially at home within this Judicial District.

12. This Court has specific jurisdiction over Spotify for numerous reasons, including, but not limited to, the following:

13. Upon information and belief, Spotify has maintained a strong presence in Nashville, including its Nashville office, since 2013 and is dedicated to building Spotify's brand and relationships within the Nashville music community. Upon information and belief, Spotify's Nashville office is designed to broker deals with, as well as secure licenses for its streaming services from, record labels, music publishers, and others in Nashville and elsewhere.

14. Upon information and belief, Spotify specifically targets Tennessee through its licensing and distribution agreements. Upon information and belief, Spotify provides targeted ads to individuals in Tennessee and Tennessee residents, including those who have streamed the Infringed Works. Upon information and belief, Spotify provides its streaming platform to individuals in Tennessee and Tennessee residents who have used such platform to stream the

Infringed Works at issue in this case.

15.     Upon information and belief, Spotify has hired top executives from within the music industry to head its streaming operations in the Nashville office. Spotify's Nashville based employees include executives such as Copeland Isaacson, who heads Spotify's Label & Artist Relations division for the Nashville office, and John Marks, who has been named Spotify's Global Head of Country Music Programming and other employees, including employees directly involved in songwriter relations.

16.     Additionally, Spotify's interactive app and website includes subscription based users located in Tennessee. Upon information and belief, Spotify has thousands of registered users in Tennessee, and the musical compositions involved in this action have been streamed to users throughout Tennessee.  As a result, the brunt of the harm caused by Spotify's actions is felt in Tennessee.  Upon information and belief, limited jurisdictional discovery would uncover a number of other jurisdictionally relevant contacts.

17.     Mr. Gaudio is a citizen of Tennessee and a resident of the Middle District, so Spotify's actions not only are directed at a Tennessee citizen as a result, but the brunt of harm caused by Spotify's actions has been felt in Tennessee. The Middle District of Tennessee has a considerable interest in adjudicating disputes wherein Tennessee residents are the target of the harm resulting from exploitation of the Infringed Works.

18.     Spotify has been put on notice by Plaintiffs of the illegal infringements, and has nonetheless continued to infringe Plaintiffs' compositions, while aware that Gaudio is a Tennessee resident.  Spotify was also well aware of its infringing activities prior to being placed on notice through other complaints, lawsuits, and otherwise, but has continuously refused to comply with United States Copyright law.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(a) because Defendant is subject to personal jurisdiction in this Judicial District and has committed unlawful acts of infringement in this Judicial District.

## FACTS

20.     Plaintiffs collectively own all or part of the Infringed Works listed on Exhibit A, attached hereto.  Each of the Infringed Works have been duly and appropriately registered with the United States Copyright Office as also indicated on Exhibit A.

21.     Spotify does not have a license to display, reproduce, distribute, and/or stream the Infringed Works due to either not procuring an appropriate license as required, or due to losing any license it may have had by not complying with the law and applicable requirements.  As the owners of the Infringed Works, Plaintiffs are entitled to full relief pursuant to the United States Copyright Act.

22.     Spotify is an interactive music streaming service (among other business services) that allows its users to access and enjoy its catalog of musical recordings using its downloadable application and web-based platform. As an interactive service, Spotify must obtain either a direct or compulsory license allowing for the streaming of each musical composition on its service. Spotify's business model offers tiered participation levels to its users, including a "premium" subscription level that allows users to interactively stream "any song" without ads, and a lower tier, non-subscription level that is supported by advertisements which play at regular intervals during use in exchange for providing users the ability to interactively stream nearly the entire Spotify library of music for free. In 2016, Spotify claimed it had more than 100 million global users that streamed songs hundreds of billions of times, which included both paying subscribers as well as users that utilize its free, ad-supported platform. In March of 2017, Spotify announced

it hit a milestone claiming it has more than 50 million paying users. In June of 2017, Spotify announced that it surpassed 140 million global monthly active users.

23.    To better understand Spotify and its service, and its willfully infringing behavior, as well as how it has been able to grow in value despite the music industry's awareness of its non-existent and non-compliant systems, it is important to understand the background of the ever-evolving music industry and how enforcement of copyright law has grown from an industry of illegal downloads to a history of sanctioned illegal streaming.

24.    In the late 1990's and early 2000's, peer-to-peer (P2P) file sharing companies became popular and allowed individuals to share music over the Internet. In response to these companies allowing users to share copyrighted works without proper licenses, the Recording Industry Association of America ("RIAA"), a trade organization comprised of United States record companies, filed lawsuits against major P2P file sharing companies, including Napster, Scour, Aimster, Audiogalaxy, Morpheus, Grokster, Kazza, iMesh, and LimeWire.

25.    On September 8, 2003, the RIAA sued 261 American music fans for sharing music on P2P file sharing networks. Within five years, the recording industry had filed, settled, or threatened legal actions against at least 30,000 individuals, including children, grandparents, unemployed single mothers, and college professors, and sought and obtained judgments in many cases for the maximum $150,000 statutory damage award per illegal download. These same record labels and others who were so vigilant in protecting their copyrights now own part of Spotify and are set to make a fortune through Spotify's public offering.

26.    Once P2P file sharing networks were effectively shut down, major music companies turned to so-called legal download and streaming services as a way to generate revenue

from their pre-recorded sound recordings. This income became the major source of revenue from the recordings that the labels controlled.

27. Spotify was established in 2005 by Daniel Elk and Martin Lorentzon in Stockholm, Sweden. The company released its first public beta version in 2007. Spotify then launched on the Apple operating system in 2007. Spotify began advertising through its interactive applications in 2008 and officially launched in the United States in June 2011. Upon information and belief, at the time of its United States launch, Spotify had between 15,000,000 and 25,000,000 sound recordings available to stream. Upon information and belief, the number of sound recordings in its service is now over 30,000,000.

28. By 2011, Spotify had reached 1,000,000 paid subscribers. By 2013, Spotify had 24,000,000 active users who had streamed 4.5 billion hours of music in 2013 alone.

29. By that time, Spotify has raised enormous amounts of money to support its business. Spotify originally raised two hundred million dollars ($200,000,000.00), and then, by the end of 2013, raised another three hundred fifty million dollars ($350,000,000.00), bringing its total raised at that time to over half a billion dollars ($500,000,000.00).

30. By 2015, Spotify announced it had 75,000,000 users overall, which included 20,000,000 paying users.

31. By the middle of 2016, Spotify raised yet another two billion dollars ($2,000,000,000.00) on top of the aforementioned five hundred million dollars ($500,000,000.00), bringing its total capital raised to over two billion five hundred million dollars ($2,500,000,000.00).

32. Under the United States Copyright Act, the owner of a copyright is entitled to certain exclusive rights, including the right to reproduce and distribute a musical work. Every

sound recording contains two separate and distinct copyrights – one copyright for the sound recording itself and one copyright for the underlying musical composition. Spotify will often make different recordings of a composition available for streaming on demand, which Spotify displays through an interface in conjunction with the name of the artist performing the recording, the name of the recording and other "metadata", and a "play" button that the user can click to play the song. In all cases, to allow for the on-demand interactive stream of a song, Spotify must have two separate licenses and pay two separate royalties. One license is for the sound recording and the second, separate license, is for the embodied musical composition. The former generates revenue for the record label, while the latter generates revenue for songwriters and their music publishers.

33. A mechanical license grants the right to reproduce and distribute copyrighted musical compositions for use on compact discs, records, tapes, ringtones, permanent digital downloads, interactive streams, and other digital formats. Anyone wishing to use a musical work is required to license the composition separately from the recording either through a direct voluntary mechanical license secured by negotiating with individual copyright owners, or, in the United States, through a compulsory mechanical license.

34. In order to obtain a compulsory license under the Copyright Act, as detailed in Section 115, a licensee, such as Spotify, is required to send a notice of intent to use a musical composition ("NOI") to each copyright owner before or within thirty days after making a phonorecord embodying the musical composition, and before distributing the work. If the name and address of the copyright owner is not known, the distributor, after putting effort into finding them, is then required to file the NOI in the Licensing Division of the Copyright Office, and then submit the statutory filing fee for each title listed in the notice in a single payment and make checks

payable to the Register of Copyrights or authorize deduction from a deposit account for the filing fee.

35.    The NOI serves the important role of requiring the music service to connect the sound recording to the composition before it makes the sound recording live so when it generates revenue the service knows whom to pay and alerts the copyright owner(s) to the use of their musical compositions and the right to fair and legally required compensation for that use. Under United States Copyright law, the failure to timely file or serve an NOI forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords an act of copyright infringement with respect to the underlying musical composition.

36.    According to Section 115 of the Copyright Act, once a license for the composition is obtained, the licensee must follow the terms of a direct license or the statutory requirements for a compulsory license which include, but are not limited to: (1) making accurate royalty payments accompanied by a compliant monthly accounting statement, (2) providing itemized details as to how the per stream rate was calculated, (3) rendering annual certified accountings to the copyright owner or authorized agent, (4) making timely payments to the administrator on or before the 20th day of each month for every phonorecord/recording made and distributed in accordance with the license, and (5) curing any breach of these requirements within 30 days of the notification. Spotify, like every other person or entity, must obtain a license and comply with the requirements of the license for the works it includes in its catalog.

37.    Prior to launching in the United States, Spotify made some efforts to license sound recordings by reaching out to labels and distributors for the metadata of each recording, but did not attempt to collect any information about the compositions that each recording embodied. It

built no infrastructure capable of collecting compositional information, and failed to ask for such information. Additionally, in a race to be the first to market, Spotify made the deliberate decision to distribute sound recordings without building any internal infrastructure to license compositions properly or comply with any of the requirements of Section 115 of the Copyright Act.

38.     Spotify did not build proper infrastructure or require sound recording rights holders to provide data as to what specific composition the sound recording embodies. Upon information and belief, Spotify makes recordings live for streaming without, in many cases: (1) knowing the identity of songwriters and publishers that should be receiving royalties; and (2) knowing or caring whether the compositions have been licensed. Songwriters and publishers are therefore placed in the very difficult position of identifying the compositions streaming on Spotify and whether licenses exist or royalties are owed.

39.     Instead of attempting to comply with United States Copyright law and build a proper system to identify the compositions available through its service, Spotify contracted with a third-party company called the Harry Fox Agency ("HFA"). HFA is a provider of rights management, licensing, and royalty services for the United States music industry that specifically issues licenses, and collects and distributes royalties on behalf of musical copyright owners. At the time of contracting with Spotify, HFA was owned by the National Music Publishing Association ("NMPA"), a trade group representing the interests of its members, including, but not limited to, the major music companies that will reap the financial benefits of a Spotify public offering. In October 2015, the NMPA sold HFA for a reported twenty million dollars ($20,000,000.00) to the private equity owned United States performing rights organization SESAC. Upon information and belief, approximately ten to fifteen percent (10% to 15%) of the sale price was held in an "escrow"

account to be liquidated at a future date if there were no unforeseen financial liabilities against HFA, for example, not getting licenses or paying inaccurately as it did for Spotify.

40. At the time that Spotify hired HFA, HFA had a database with less than the number of recordings and compositions available in the Spotify library. Between this insufficient database, Spotify's piecemeal system, and HFA's own lack of a system capable of complying with the statutory requirements for compulsory licensing, copyright infringement was assured. Despite knowledge of these deficiencies, Spotify moved forward with a non-compliant system that allowed for massive infringement from its launch in the United States in June 2011.

41. Upon information and belief, there are approximately 35 billion (35,000,000,000) unpaid streams that occurred from June of 2011 to the end of 2015. This means Spotify failed to pay approximately fifteen million dollars ($15,000,000.00) in royalties. According to a recent NMPA communication with its members, this figure is estimated to increase to another 140 billion (140,000,000,000) to 280 billion (280,000,000,000) unpaid streams totaling between sixty million dollars ($60,000,000.00) to one hundred twenty million dollars ($120,000,000.00) through 2019. Spotify has not only admitted to its failure to pay out these royalties, but also has shown it knew it was unlicensed for many of them and, if licensed, was not paying them accurately, on time, or in compliance with any of the other Section 115 requirements, thereby making the royalty statements non-compliant.

42. Nevertheless, despite raising over two and one-half billion dollars ($2,500,000,000.00), Spotify has refused to invest in building a compliant solution. To make matters worse, when Spotify's scheme is discovered by a rights holder, and Spotify is notified of lack of a license or termination of licenses due to the failure to comply with legal requirements, Spotify nonetheless continues to willfully and knowingly exploit the compositions.

13

43.     Spotify's history is riddled with these notifications.  It has previously been pursued for failure to properly license compositions or pay for licenses, most notably by the NMPA on behalf of its membership. Spotify was quick to enter into a settlement agreement that required it to pay out the fifteen million seven hundred thousand dollars ($15,700,000.00) in unpaid royalties it was holding onto along with an additional five million dollar ($5,000,000.00) penalty to those NMPA members who voluntarily participated in the settlement.  Sadly, this "settlement" was woefully insufficient financially and nothing more than a way to allow the major music companies, who are the largest members of the NMPA, to help Spotify along to a public offering as, upon information and belief, collectively their affiliated record labels own over 18% of Spotify and stand to make over seven hundred million dollars ($700,000,000.00) each with Spotify's thirteen billion dollar ($13,000,000,000.00) public offering.

44.     In addition, the NMPA settlement did nothing to resolve the outstanding issues with the Spotify licensing and royalty payment system as the settlement allowed Spotify to continue to not pay accurately and did not require it to build any systems moving forward. Add to this that the NMPA settlement only applies to the select members of the NMPA. Finally, the settlement itself encouraged the continued infringement by Spotify as evidenced by the NMPA's recent June, 2017 email that indicated that the amount of unpaid royalties would grow after the settlement agreement was entered into (meaning Spotify was not required to put in the needed compliancy systems). Spotify was, and continues to be, abundantly aware that its systems were not, and are not, working and that it was, and is, non-compliant with the terms of any license it may have entered into.

45.     In addition to the NMPA settlement for non-compliance and infringement, Spotify also agreed to settle a class action lawsuit for forty three million four hundred thousand dollars ($43,400,000.00). The intent of the settlement is to compensate rights holders for Spotify's years of

14

infringing actions. However, the settlement is also woefully insufficient to pay songwriters and publishers for the infringement by Spotify. Upon information and belief, there are over 100,000 unique individuals who meet the criteria to be in the class with an interest in approximately 8,000,000 compositions. Upon information and belief, the class attorneys will be taking approximately 25% of the settlement payout, which leaves, approximately, a mere thirty-two million dollars ($32,000,000.00) to be divided between the composition owners. Averaging the payout for each owner, Spotify will be allowed to walk away after paying approximately four dollars ($4.00) per infringed composition. Such a settlement is essentially an empty gesture that encourages infringement and is entirely insufficient to remedy years of illegal activity.

46.    The non-financial terms of the class action settlement are also unacceptable as they force class members to license their works to Spotify moving forward whether they wish to do so or not. In addition, if Spotify breaches the terms of the license, which it has already indicated it will do in the NMPA settlement, the rights-holder can never terminate the license as the class settlement is forcing the rights-holder to grant a license "in perpetuity." Therefore, even if Spotify breaches and does not cure, Spotify can never be held liable for infringement. It now has a license and no incentive to build the required systems as there is no penalty if they continue to operate without doing so. In effect, Spotify is being rewarded for willfully infringing on copyrights.

47.    Upon information and belief, a number of major record labels, including Sony BMG, Universal Music Group, Warner Music, and EMI, allowed Spotify to use their sound recordings in its service in exchange for being allowed to purchase a stake in Spotify at below market value. In some cases, equity in Spotify was provided to sound recording rights holders for no additional compensation. As a result of these deals, upon information and belief, the major record labels own an approximate eighteen percent (18%) stake in Spotify. With a successful

Spotify public offering, this allows the labels to potentially generate over half a billion dollars each, none of which they need to share with the copyright creators, performing artists, or songwriters. These record labels, who control their affiliated publishing companies, therefore had no incentive to pursue or truly hold Spotify accountable for its actions.

48.     Spotify's illegal behavior and its willful and deliberate disregard of United States Copyright law is clearly demonstrated in Plaintiffs' case, which shows specific efforts by Plaintiffs to gain compliance from Spotify to no avail.

49.     As of September, 2014, Plaintiffs' exclusive digital media licensing rights in the Infringed Works are administered by Audiam, Inc. ("Audiam").

50.     Audiam was familiar, and became even more familiar over time, with Spotify's inability to comply with the terms of any compulsory license due to Spotify's public acknowledgements, the NMPA settlement, the two class action lawsuits, Audiam's own research, and Audiam's attempts to get Spotify to comply. Therefore, in an attempt to help Spotify be compliant in paying Plaintiffs the proper royalties owed for the exploitation of the Infringed Works, Audiam supplied Spotify with not only all of the composition metadata, but also went the extra step and provided a list of sound recordings in the Spotify library that embodied Plaintiffs' Infringed Works. Audiam supplied this information twice, first at the onset of its administration of Plaintiffs' catalog, and again many months later when Spotify was still not compliant. As discussed more specifically in the paragraph below, the information provided by Audiam shows that Spotify's public excuses of not having the information to pay appropriately are false.

51.     Specifically, for a period of over two years, Audiam regularly communicated with both Spotify and HFA about the flaws in the system with regard to identifying the writers and publishers of compositions, failure to send proper or accurate accounting statements, failure to

provide certified accountings, failure to comply with statutory licensing requirements, and the fact that the number of sound recordings embodying the compositions which Audiam was receiving royalties for was far less than the number of sound recordings embodying the compositions that had streamed on the Spotify service in the United States.

52. Additionally, as noted, in an attempt to help get its client paid, Audiam repeatedly sent Spotify all available data necessary to properly license and pay for sound recordings embodying the Infringed Works and even offered to build a system for Spotify that allows for compliant licensing and payment for use of the compositions. This data was specific and included the International Standard Recording Code ("ISRC") associated with the sound recording in addition to specific line item detail obtained from Audiam's audits of Spotify's own incomplete and inaccurate royalty statements.

53. Each recording delivered to Spotify and made available to stream on its service is required to have a unique 12 digit alphanumeric code called an International Standard Recording Code ("ISRC"). The ISRC code is the international identification system for sound recordings. Each ISRC is a unique and permanent identifier for a specific recording, independent of the format on which it appears (CD, audio file, digital version for streaming, etc.) or the rights holders involved. Only one ISRC is to be issued to a track, and an ISRC can never represent more than one unique recording.

54. The Recording Industry Association of America ("RIAA") has been appointed by the International ISRC Agency to oversee the ISRC system within the United States and its territories. As the United States Agency, RIAA promotes and monitors the ISRC system within the United States and its territories as well as issues and assigns ISRCs. Spotify requires that each sound recording delivered to them have an ISRC in order for that recording to be eligible to be

available to stream in its service. Spotify uses ISRCs in their royalty statements as it provides to record labels and music publishers a list of each recording and its associated ISRC that has streamed in its service. However, upon information and belief, Spotify's data for its sound recordings (while including the associated ISRCs), does not include all of the compositional data (including identification of songwriter(s) and music publisher(s)) for the underlying composition embodied in a sound recording that Spotify makes available for streaming, which makes it very difficult for music publishers to know for certain whether their musical compositions are streaming on Spotify, and to ensure that Spotify is paying proper royalties for streams of their compositions.

55.     As a result, while Plaintiffs, through painstaking analysis, have identified ISRCs for many of the musical compositions involved in this action (e.g., the Exhibit B musical compositions), the remaining compositions (e.g., the Exhibit C musical compositions) are all associated with sound recordings, upon information and belief, have streamed on Spotify without payment to Plaintiffs, and, in all likelihood, without a license. Spotify's opaque and incomplete reporting makes it very difficult, if not impossible, to identify the extent of its infringement without access to Spotify's internal systems and information.

56.     Audiam sent Spotify specific notice of its violations of the compulsory license provisions of Section 115 of the Copyright Act. Audiam sent Spotify a list of the specific musical compositions owned or controlled by Audiam on behalf of Plaintiffs. Audiam specifically informed Spotify that as a distributor of sound recordings, it was required to either obtain a direct mechanical license, or comply with the compulsory license provisions of Section 115, by sending the qualifying NOI to the copyright owner or to the Copyright Office before or within thirty (30) days after making, and before distributing, any phonorecords embodying the compositions.

57.     After notifying Spotify of its non-compliance, Audiam and Spotify entered into a temporary direct license agreement which licensed the Infringed Works for the retroactive period of January 1, 2014 through November 30, 2014. When Spotify failed to engage in any way with Audiam to fix or cure the issues with its non-compliant system and then continued not to pay Audiam the correct royalties for Plaintiffs' Infringed Works or follow all the terms of the temporary direct license, Audiam again notified Spotify that it was in breach and that the direct license, which already would automatically expire at the end of the five (5) month term, was effectively terminated in November of 2014. Spotify acknowledged its lack of license for the Infringed Works but continued to exploit them with no license.

58.     Further demonstrating Spotify's knowledge of its continued infringement of the Infringed Works, on December 15, 2015, Audiam sent notice to Spotify that any direct license between Audiam and Spotify was terminated. Specifically, the letter stated "[t]he direct license between Audiam and Spotify expired on November 30 [2014]. For those compositions that were previously direct licensed Spotify has no license ….. In addition, Spotify did not live up to the obligations of that direct license agreement. For many catalogs, Audiam was paid nothing over the four months (or ever). … For those licensed under the compulsory [license], Spotify also did not pay on time, at all or, for the limited payments we did receive, they were not accurate."

59.     A year and a half later, on June 16, 2016, after repeatedly trying to obtain Spotify's compliance, Audiam sent a letter to Spotify on Plaintiffs' behalf demanding proof of licensing as well as notifying Spotify that it had no right to make the Infringed Works available for streaming and that it did not have the right to otherwise exploit Plaintiffs' catalog. Audiam notified Spotify that it had neither negotiated a new direct mechanical license following the one that expired in November of 2014 for the use of Plaintiffs' catalog, nor complied with the requirements for issuing

a compulsory license pursuant to Section 115 of the United States Copyright Act. Finally, Audiam indicated that if there was a license that it was not able to find one, and that it was putting Spotify on notice that it was in breach. Attached to its letter, Audiam included a list of the Plaintiffs' Infringed Works.

60.     Audiam specifically informed Spotify that "[f]ailure to timely serve or file a valid NOI forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement under and fully subject to the remedies provided by the Copyright Act."

61.     Additionally, Audiam informed Spotify that they did not have any record of timely and valid NOI's with regard to Plaintiffs' compositions. Audiam further informed Spotify they were not aware of any valid direct licenses and accountings nor payments made thereunder. Audiam put Spotify on notice that its distribution of the recordings embodying Plaintiffs' compositions have been infringing, and continue to infringe, Plaintiffs' copyrights in the Infringed Works. For any compositions that Spotify claims they obtained a license, Spotify is required to make royalty payments, accompanied by a monthly statement of account, to the copyright owner or authorized agent of the owner on or before the 20th day of each month for every phonorecord made and distributed in accordance with the license.  The monthly statement of account shall be clearly and prominently identified as a "Monthly Statement of Account Under Compulsory License for Making and Distributing Phonorecords."  See 37 C.F.R. § 210.16. Spotify further failed to comply with 37 C.F.R. § 210.16 by failing to file a detailed annual statement of account, certified by a certified public accountant.  Instead of complying with copyright law and sending a NOI or obtaining a proper license, Spotify chose to willfully infringe on Plaintiffs' rights.  Because of this, and the other facts mentioned above, Audiam, on behalf of Plaintiffs, specifically gave

20

notice of intention to terminate any license that Spotify could argue they had or any license they may have had for the compositions at issue in this litigation.

62.     As Section 115 indicates, a licensor has the right to terminate any type of Section 115 license for failure to cure any provision of the licenses, including non-payment of royalties, lack of certified statements, or late payments, after 30 days. Furthermore, a material breach of the license agreement can terminate a license or create a right of recapture. Spotify did not cure its failure to comply with any Section 115 license it may have initially obtained within 30 days of the aforementioned letters. Therefore, as provided in the letter to Spotify, any compulsory or other license Spotify may have initially obtained was terminated. Accordingly, Spotify's continued exploitation of the Exhibit A musical compositions have been actionable as acts of willful infringement under Sections 501 of the United States Copyright Act and fully subject to the remedies provided by Sections 502, *et seq*.

63.     All of the foregoing was sufficient to terminate any compulsory license with Plaintiffs or any co-owner.  Spotify has been, and continues to be, willfully infringing the Exhibit A musical compositions involved in this action since termination, and, as discussed above, has likely been illegally distributing those musical compositions identified in Exhibits B and C hereto without a license since inception.

64.     After the cure period, Audiam attempted to return to Spotify any money it was paid for the unlicensed compositions. Audiam asked nine times, over three months, for a way for Audiam to return any such money to Spotify. Audiam then simply sent Spotify a check eight months ago to ensure that Spotify was aware of the incorrect royalty payments. Spotify never cashed the check and, to this day, refuses to work with Audiam to return any erroneous payments. Specifically, Audiam wrote to Spotify stating that Spotify did not have a license and "[c]onsequently, do not pay Audiam

royalties for unlicensed compositions. If you continue to force a direct deposit on us, that is a unilateral act on the part of Spotify without consent of Audiam. Please provide us with the information necessary to return any payment . . . ."

65.     Under either scenario, whether because Spotify never licensed the compositions, or because any such licenses have been terminated, Spotify has continued to exploit compositions, including Plaintiffs' Infringed Works, without a license to do so and has therefore engaged in continuous actionable acts of copyright infringement.

66.     Spotify's public defense to its wrongdoing has been to claim that the data is simply not available for it to track the compositions and the sound recordings that embody them on its service in order to prevent wholesale copyright infringement. Yet, as the foregoing demonstrates, that position is simply untrue.

67.     Prior to filing suit, Audiam, upon further review of Plaintiffs' catalog, confirmed that at least 4 of the Infringed Works, listed on Exhibit B, had at least one sound recording (and that sound recording's associated ISRC) that embodied the compositions that were streaming on Spotify. A single composition could have many sound recording as many other artists could record the same song. For the 4 Exhibit B musical compositions, whether it was true that a single sound recording of the song was available on Spotify or many sound recordings of the composition were available on Spotify, there was no royalty payment made to Plaintiffs at all. Upon information and belief, for at least those compositions that Spotify never paid royalties on at all, Spotify never, at any time, had a license. Further, upon information and belief, the 28 compositions attached hereto as Exhibit C (those musical compositions which Plaintiffs previously cross-referenced against statements received by Spotify based on the name of the musical composition and name of the

22

music publisher and found no payment) have been streamed and/or continue to be streamed on Spotify without payment and/or, in all likelihood, appropriate licenses.

68.     Spotify's business practices are reminiscent of the primitive illegal file sharing companies. This is shocking considering the record companies that once made headlines for vigorously pursuing claims against Napster, children, grandparents, and others, are the same companies that have invested in Spotify with a knowledge of Spotify's lack of systems necessary to properly license and properly pay for the use of music. However, the fact that the major music companies collectively stand to make billions of dollars with Spotify's initial public offering may explain their actions (or lack thereof).

69.     By knowingly reproducing and distributing musical compositions without the licenses necessary to legally reproduce and distribute the music, Spotify has been and is willfully infringing upon the copyrights of the Exhibit A musical compositions, as well as the copyrights of music publishers that are not party to this litigation.

## CAUSES OF ACTION

### COUNT I

### Direct Copyright Infringement

70.     Plaintiffs repeat and re-allege each of the foregoing paragraphs, as though fully set forth herein.

71.     Spotify has made unauthorized reproductions and engaged in unauthorized distributions of Plaintiffs' musical compositions. The infringement of these copyrights is in violation of 17 U.S.C. §§ 106, *et seq.* and 501.

72.     Spotify has violated many of the exclusive rights enumerated under Section 106 of the United States Copyright Act by its activities discussed above. Among other things, each stream

Case 3:17-cv-01052   Document 1   Filed 07/18/17   Page 23 of 25 PageID #: 23

of the Infringed Works reproduced by Spotify and/or distributed to end-users constitutes a separate and distinct act of infringement, for which Spotify is a direct infringer.

73.     Spotify's conduct has at all times been knowing, willful, and with complete disregard to Plaintiffs' rights and objections.

74.     The infringement by Spotify has been, and continues to be, willful and knowing.

75.     Pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to actual damages, including the substantial profits of Spotify, as will be proven at trial.

76.     In the alternative, pursuant to 17 U.S.C. § 504(c), Plaintiffs are entitled to receive the maximum amount of statutory damages for willful copyright infringement, $150,000.00 per composition, for each of the musical compositions identified in Exhibit A hereto.

77.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant and for the following relief:

A.     A declaration that Defendant has willfully infringed Plaintiffs' copyrighted works in violation of the Copyright Act;

B.     A declaration that Defendant is directly liable for copyright infringement;

C.     A declaration that Plaintiffs are entitled to receive all revenue associated with all exploitations of the Infringed Works, commencing from the date of judgment and for all amounts not taken into consideration in the judgment;

D.     An award of damages pursuant to 17 U.S.C. § 504(b), including actual damages, inclusive of the injury to the market value of their copyright in the Infringed Works, and the profits of Defendant as will be proven at trial, including a finding that Defendant and other entities under

the Spotify umbrella are "practical partners" of each other and thus jointly and severally liable for the profits of each other, or, in the alternative, the maximum amount of statutory damages pursuant to 17 U.S.C. § 504(c), $150,000.00 for each act of willful infringement with respect to each of the musical compositions involved in the action;

        E.      An award of attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and under other applicable law;

        F.      For pre-judgment and post-judgment interest according to law, as applicable; and

        G.      For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), and otherwise, Plaintiffs respectfully demand a trial by jury.

Dated: July 18, 2017

By: _Richard S. Busch_
Richard S. Busch (TN Bar # 14594)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201
Telephone:    (615) 726-5422
Facsimile:     (615) 726-5417
rbusch@kingballow.com

John E. Mason, Jr. (TN Bar # 32680)
LAW OFFICE OF JOHN MASON, LLC
40 Music Square West
Nashville, TN 37203
Telephone:    (615) 259-5325
Facsimile:     (615) 259-5321
john@mason.legal

25